

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York  10007*

April 10, 2008

**By Hand**

The Honorable John F. Keenan
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 533
New York, New York 10007

> Re:    United States v. Rodolphe Nogbou
>        07 Cr. 814 (JFK)

Dear Judge Keenan:

        The Government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for Wednesday, April 16, 2008, at 10:00 a.m., and in response to the defendant's submission, filed on April 7, 2008 ("Deft. Ltr."). For reasons set forth below, the Court should reject the defendant's request for a sentence of time-served. The Government respectfully submits that a sentence in this case within the advisory United States Sentencing Guidelines (the "Guidelines") range of 24 to 30 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## I. Background

### A.    The Complaint and Indictment

        The defendant was charged in a criminal complaint filed on August 22, 2007, with violating Title 18, United States Code, Section 111, by forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with Court Security Officer ("CSO") Vincent Esposito, while CSO Esposito was performing his official duties at the Daniel Patrick Moynihan United States Courthouse (the "Courthouse"). On August 29, 2007, a federal grand jury charged the defendant in a one-count indictment with assaulting a federal officer, and causing bodily injury, in violation of Title 18, United States Code, Section 111(a), (b). The defendant has been remanded since his arrest.

The Honorable John F. Keenan
April 10, 2008

## B.    The Trial and Verdict

### 1.    The Government Case

Trial of this matter began on January 7, 2008.  The Government's case consisted of six witnesses: the victim, CSO Esposito; four other eyewitnesses to the assault, including three CSOs (James Russo, William Horvath, and Joseph Calvacca) and a special agent with Immigration and Customs Enforcement (Brian Herbert); and Diane Chappelle, a custodian of records from New York Downtown Hospital.

In the early afternoon hours of August 22, 2007, CSOs Esposito, Russo, Horvath, and Calvacca were assigned to the security checkpoint at the Worth Street entrance to the Courthouse.  *See* Tr. at 61, 201–02, 231, 247.  CSO Russo was the expediter, responsible for directing visitors through the security area and instructing visitors to place certain items on the security belt to be x-rayed.  *See* Tr. at 62, 200–01.  CSO Calvacca was operating the x-ray machine, with the assistance of CSO Horvath.  *See* Tr. at 62, 201–02, 231, 246.  CSO Esposito was responsible for clearing visitors of all metal before they enter the Courthouse.  *See* Tr. at 61, 202.  CSO Esposito's responsibilities included using a handheld security wand to screen anyone who set off the metal detector for weapons or otherwise prohibited objects.  *See* Tr. at 58.

CSO Russo, as the expediter, first observed the defendant when he entered the Courthouse at approximately 12:15 p.m. on August 22, 2007.  *See* Tr. at 202.  The defendant was wearing an outfit that resembled ski pants or overalls, with a bib and many large metal zippers.  *See* Tr. at 65, 204.  The defendant entered the Courthouse talking to himself and, when instructed by CSO Russo to empty his pockets, responded, "this is bullshit."  Tr. at 203.  CSO Esposito similarly testified that, when instructed to empty his pockets, the defendant became "quite irritated" and "was using vulgar language and saying . . . why he had to go through all this 'bullshit' to enter our courthouse."  Tr. at 65.  CSO Calvacca recalled that the defendant entered the building, "acting erratic, speaking to himself, cursing, and raising his hands."  Tr. at 232.

The defendant emptied his pockets, continued to mumble and curse, and walked through the metal detector.  *See* Tr. at 65–66, 205.  As the defendant proceeded through the metal detector, he activated the alarm, triggering a secondary security check, conducted by CSO Esposito using a handheld security wand.  *See* Tr. at 66, 205.  CSO Esposito asked the defendant to lower the bib portion of his outfit, thereby permitting examination of the upper portion of the defendant's body.  *See* Tr. at 66.  CSO Esposito explained that the purpose of this check was to screen the defendant for "anything unusual: weapons, explosives, things of that nature."  Tr. at 67.

As CSO Esposito attempted to perform this security check, the defendant cursed and hollered, complaining to the other officers, "Why are you breaking my f'ing balls?"  Tr. at 67, 82; *see also* Tr. at 207 (CSO Russo recalling, the defendant "was spewing profanities . . . like

-2-

The Honorable John F. Keenan
April 10, 2008

this is bullshit, you are all assholes"); Tr. at 233 (CSO Calvacca recalling, the defendant "was saying 'fuck this' and 'fuck that,' 'this is fucking bullshit,' 'you guys are assholes,' 'why do I have to go through this fucking shit,' things like that"); Tr. at 248 (CSO Horvath recalling, the defendant "seemed to be aggravated and irate that he had to go through this process. And there was a little cursing and swearing on his part.").

   In the face of the defendant's profanity, CSO Esposito maintained his professionalism, treating the defendant with respect and waiting for the defendant to calm down. *See* Tr. at 67–68, 207. CSO Esposito then used the security wand to search the upper portion of the defendant's body, while the defendant continued to complain. *See* Tr. at 68.

   The security wand activated when it passed the defendant's waist area, which CSO Esposito explained is an area where people tend to keep weapons. *See* Tr. at 70. CSO Esposito attempted to determine what activated the wand, and the defendant "very violently" came up striking CSO Esposito in the left eye. Tr. at 71. CSO Esposito recalled, the defendant brought "his fist right into my face," using "very violent" force. Tr. at 72.

   The other CSOs working at the security checkpoint each viewed the assault from a different vantage point, but each gave consistent testimony. CSO Calvacca was stationed near the x-ray machine, approximately five feet away with an unobstructed view of the assault. *See* Tr. at 235. CSO Calvacca observed that when the security wand went off, the defendant "reared his hands up" and struck Officer Esposito "on the left side of his face." Tr. at 234–35. CSO Calvacca explained that, when the defendant struck CSO Esposito, the defendant "was cursing and he was clearly annoyed. He was still ranting and raving, why did he have to go through all this." Tr. at 235. CSO Horvath had a more obstructed view of the assault than CSO Calvacca, but still was able to observe the defendant "starting to swear, starting to get aggravated and annoyed," and then bring his hands up "in a flaring . . . motion," causing CSO Esposito to "back off a little bit." Tr. at 249–50. CSO Russo, whose position gave him a view of the defendant's back, testified, "the defendant came up very fast with his hands. Extremely fast. And I saw Officer Esposito go backwards." Tr. at 208.

   The last eyewitness was Special Agent Brian Herbert, whose job responsibilities happened to bring him to the vicinity of the Worth Street entrance at the time of the assault. *See* Tr. at 259. Special Agent Herbert saw the defendant behave "confrontational in nature," while "the officers were being extremely professional" as they attempted to do their jobs. Tr. at 263. Special Agent Herbert observed that, as Officer Esposito pass the security wand over the defendant's waist area, the defendant "struck out at the officer" by throwing his hands up. Tr. at 264. Special Agent Herbert testified that he "definitely" saw the defendant "make contact with the officer," and recalled the officer being struck in the arms and pushed back, with a "forceful kind of move." Tr. at 265. Special Agent Herbert also recalled the defendant saying, "get your fucking hands off of me" as he struck Officer Esposito. Tr. at 266.

The Honorable John F. Keenan
April 10, 2008

After the defendant struck him, CSO Esposito pushed the defendant toward the x-ray belt, where the other officers joined to subdue the defendant. *See* Tr. at 72. The officers escorted the defendant back through the metal detector, to move him away from the area where law enforcement officers check their weapons. *See id.* CSOs Russo, Calvacca, and Horvath soon observed that CSO Esposito was bleeding from the face, and the defendant was placed under arrest. *See* Tr. at 73, 208–09, 235–36.

CSO Esposito received medical attention at the fourth floor of the Courthouse to stop the bleeding. *See* Tr. at 88. CSO Esposito then was transported to New York Downtown Hospital, where he received two stitches to his left eye and a tetanus shot. *See id.* Medical records from New York Downtown Hospital confirmed that CSO Esposito suffered a laceration above his left eyebrow, which a plastic surgeon closed with a suture. *See* Tr. at 192–93, 195.

2.    **The Defense Case**

The defendant testified in his own defense. The defendant testified that he had come to the Courthouse about a dozen times prior to August 22, 2007. *See* Tr. at 308. The defendant stated that his most recent trip before August 22, 2007 was about three weeks earlier, when he was "coming to serve papers to the *pro se* office." *Id.* The defendant claimed that, on this occasion, a female CSO at the security checkpoint asked him a "lewd" question, and attempted to undo the zipper on his pants. Tr. at 310.

The defendant testified that he was entering the Courthouse on August 22, 2007, to filed an amended complaint with the *pro se* office. According to the defendant, after he activated the metal detector, CSO Esposito "put his face straight into [the defendant's] face," and instructed the defendant to "take off [his] pant[s]." Tr. at 314. The defendant testified that he then undid the two straps that held up the pants and lowered the bib. *See* Tr. at 316–17.

According to the defendant, he complained to the other CSOs about the manner in which he was being treated by Officer Esposito. *See* Tr. at 317–18. The defendant claimed that CSO Esposito then resumed the security check, and inserted the security wand "between [the defendant's body] and the pants," in a manner that was "going to [the defendant's] private part." Tr. at 323. The defendant maintained that, in response, he put his hand inside his pants and "just sort of swept the [wand]" away. Tr. at 325.

The defendant insisted that his hand did not make contact with CSO Esposito's face, *see* Tr. at 327, nor did he believe that the wand struck the officer, *see* Tr. at 329. The defendant stated that he was pushed against the table near the x-ray machine, and then proceeded toward the exit. *See* Tr. at 331–32. The defendant testified that, as he was walked toward the exit, he said to CSO Esposito, "I will not allow you to obstruct me from coming into the building to do my business," and, "I will take a civil action against you." Tr. at 332.

-4-

The Honorable John F. Keenan
April 10, 2008

 Notwithstanding the testimony of several witnesses to the contrary, the defendant testified on cross-examination that he never cursed as he proceeded through the security area, and professed, "I don't curse, I don't swear." Tr. at 352. The defendant maintained that he was not agitated, that he remained calm and collected, and that he never directed any profanities toward the officers or called CSO Esposito a name. *See* Tr. at 355, 357.

 **3.** **The Jury Verdict**

 The jury returned its verdict on January 11, 2008. In a special verdict form, the jury found the defendant not guilty of the enhanced penalties under Title 18, United States Code, Section 111(b), for assault of a federal officer causing bodily injury. The jury found the defendant guilty of the felony of assaulting a federal officer, with physical contact, in violation of Title 18, United States Code, Section 111(a).

**C.** **The Probation Department's Recommended Sentence**

 In the Presentence Investigation Report, the Probation Department calculated an offense level of 15, a Criminal History category of I, and a resulting advisory Guidelines range of 18 to 24 months. *See* Presentence Investigation Report ("PSI") ¶¶ 23, 28, 58.

 The Probation Department calculated the offense level as follows. The calculation began with a base offense level of 10, pursuant to Guidelines Section 2A2.4(a). The Probation Department added two adjustments to this base level based on specific offense characteristics. First, the Probation Department calculated a three-level increase, pursuant to Guidelines Section 2A2.4(b)(1)(A), because the offense involved physical contact.

 Second, the Probation Department calculated a two-level increase pursuant to Guidelines Section 2A2.4(b)(2), because the victim, CSO Esposito, suffered bodily injury. The Probation Department concluded that the jury's acquittal on the enhanced penalties of 18 U.S.C. § 111(b) did not preclude the imposition of a two-level increase for bodily injury:

> The victim, CSO Esposito, suffered bodily injury, as defined under § 1B1.1, Application Note #1, subsection (B), since his injury was painful and obvious (he was bleeding), and he needed to seek medical attention. Therefore, pursuant to § 2A2.4(b), a two-level increase is warranted. Although the jury acquitted the defendant of the enhanced penalties under 18 USC 11(b), by finding him not guilty of committing bodily injury, case law has held, under U.S. v. Watts, 519

The Honorable John F. Keenan
April 10, 2008

> U.S. 148, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997), that acquitted conduct may be relied on for sentencing purposes because sentencing facts need only be established by a preponderance of the evidence (U.S. v. Concepcion, 983 F.2d 369 (2d Cir. 1992)).

PSI ¶ 15.

The Probation Department determined that the defendant was not entitled to any adjustment for acceptance of responsibility, because "the defendant was found guilty, via jury trial." PSI ¶ 20.

The Probation Department declined to determine whether a two-point obstruction of justice enhancement was warranted pursuant to Guidelines Section 3C1.1, and instead deferred to Your Honor on that issue:

> During the trial, the defendant claimed that he never struck CSO Esposito in the face, even though CSO Esposito and at least one other court security officer testified to the contrary. Since Your Honor presided over Nogbou's trial, we believe that Your Honor is in the best position to determine whether the defendant lied or provided false testimony during his trial, to a level warranting an enhancement for Obstruction of Justice.

PSI ¶ 10. Accordingly, the sentence recommended by the Probation Department did not include an obstruction of justice enhancement.

The Probation Department recommended a term of imprisonment of 18 months, to be followed by 3 years' supervised release, and the imposition of a mandatory $100 special assessment. *See* PSI p. 15.

## II.  Argument

### A.    The Appropriate Base Offense Level Is Found At Guidelines Section 2A2.4

The defendant argues that Probation Department improperly applied a base offense level of 10, pursuant to Guidelines Section 2A2.4, which applies to "Obstructing or Impeding Officers." *See* Deft. Ltr. at 1. The defendant argues that Guidelines Section 2A2.3, which applies to "Minor Assault" and carries a lower base offense level of 4, instead should be applied in this case. *See id.* at 1–2. This is a fundamentally flawed reading of the Guidelines.

The defendant essentially argues that, because the jury acquitted him of the enhanced penalties of 18 U.S.C. § 111(b), the Guidelines provisions governing "Minor Assault"

The Honorable John F. Keenan
April 10, 2008

must apply. The defendant asserts that, because Application Note 1 to Guidelines Section 2A2.3 defines "minor assault" as a misdemeanor assault or a felonious assault not governed by Section 2A2.2, that application note "makes clear that under the instant circumstances, taking into consideration both the jury's verdict and the uncontradicted trial evidence[,] U.S.S.G. 2A2.2 must be applied by the court in determining the appropriate guideline range when sentencing the defendant." Deft. Ltr. at 2.  The defendant is simply wrong.

There is absolutely no legal or logical basis for the defendant's suggestion that Section 2A2.4 is limited to convictions under the enhanced penalties of § 111(b), and not convictions under only § 111(a).  The defendant was not convicted of minor assault, or of any crime governed by Guidelines Section 2A2.3 for that matter.  The defendant was convicted of the felony of assaulting a federal officer under 18 U.S.C. § 111(a).  That felony is squarely governed by Guidelines Section 2A2.4.

Title 18, United States Code, Section 111(a) criminalizes obstructing or impeding a federal officer, which is the very conduct covered by Guidelines Section 2A2.4 – and the very conduct committed by the defendant.  The Commentary to Section 2A2.4 makes clear that it applies to, *inter alia*, 18 U.S.C. § 111.  Appendix A to the Guidelines likewise specifies that 18 U.S.C. § 111 is governed by either Guidelines Section 2A2.2 or 2A2.4.[1]  Section 2A2.3, in contrast, does not apply to 18 U.S.C. § 111.  *See* U.S.S.G. § 2A2.3, Commentary ("Statutory Provisions: 18 U.S.C. §§ 112, 115(a), 115(b)(1), 351(e), 1751."); U.S.S.G. Appendix A.

In line with this plain reading of the Guidelines, the Second Circuit has confirmed that "Section 2A2.4(a) of the Guidelines provides the base offense level for all three categories of conduct under 18 U.S.C. § 111 (along with myriad other federal crimes)."  *United States* v. *John*, 07-3120-cr, 2008 WL 80405, at *2 (2d Cir. Jan 8, 2008).  Courts thus have consistently applied Guidelines Section 2A2.4 to felony convictions under § 111(a), even where the defendant was not convicted of the enhanced penalties of § 111(b) associated with causing bodily injury.  *See, e.g.*, *United States* v. *Grimes*, 219 Fed. Appx. 552, 556, 2007 WL 755189, at *3 (7th Cir. March 14, 2007) (applying Guidelines Section 2A2.4 to conviction under 18 U.S.C. § 111(a)); *United States* v. *Taliaferro*, 211 F.3d 412, 415–16 (7th Cir. 2000).  Courts even have affirmed the application of Guidelines Section 2A2.4 to convictions of misdemeanor simple assault under 18 U.S.C. § 111(a).  *See United States* v. *Obando-Romero*, 246 Fed. Appx. 226, 2007 WL 2461813, at *1 (4th Cir. Aug. 24, 2007); *United States* v. *McCulligan*, 58 Fed. Appx. 545, 546, 2002 WL 31953512, at *1 (3d Cir. Dec. 24, 2002).

---

[1]     Guidelines Section 2A2.2 covers "aggravated assault," which is defined as "a felonious assault that involves (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) serious bodily injury; or (C) an intent to commit another felony."  U.S.S.G. § 2A2.2, Appl. Note 1.

The Honorable John F. Keenan
April 10, 2008

        The basis for the defendant's reliance upon *Apprendi* v. *New Jersey*, 530 U.S. 466
(2000), is unclear.  *See* Deft. Ltr. at 2 ("To [not apply U.S.S.G. § 2A2.2] would clearly be a
violation of both the Application Note and <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).").  The
Supreme Court held in *Apprendi* that "any fact that increases the penalty for a crime beyond the
prescribed statutory maximum must be submitted to jury, and proved beyond reasonable doubt."
530 U.S. at 490.  Here, the defendant was convicted of the felony offense under 18 U.S.C.
§ 111(a), which carries a statutory maximum of 8 years' imprisonment, well above the advisory
Guidelines range of 24 to 30 months' imprisonment.

        In sum, the Probation Department clearly applied the appropriate Guideline,
Section 2A2.4.  Under Guidelines Section 2A2.4(a), the base offense level for the offense is 10.

**B.      The Court Should Impose a Two-Level Upward Adjustment for Obstruction of
         Justice Pursuant to Guidelines Section 3C1.1**

        The Probation Department deferred to the Court on the issue of whether to impose
an obstruction enhancement, correctly noting that the Court stands in the best position to evaluate
the defendant's trial testimony.  The record clearly indicates that the defendant willfully and
intentionally testified falsely concerning materials matters at trial and that the two-level
enhancement for obstruction of justice should be imposed.

        Section 3C1.1 of the Guidelines provides a two-level enhancement for obstructive
conduct, including situations in which a defendant commits perjury as to a material matter during
testimony at trial.  That provision requires a two-level upward adjustment:

            [i]f . . . the defendant . . . attempted to obstruct or impede, the
            administration of justice during the course of the investigation,
            prosecution, or sentencing of the instant offense of conviction,
            and . . . the obstructive conduct related to the defendant's offense of
            conviction and any relevant conduct.

U.S.S.G. § 3C1.1.  The enhancement applies where a defendant, testifying under oath,

            gives false testimony concerning a material matter with the willful
            intent to provide false testimony, rather than as a result of confusion,
            mistake or faulty memory.

*United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993).

The Honorable John F. Keenan
April 10, 2008

Before applying an obstruction enhancement based on perjury, the sentencing
court must find:

> that the defendant (1) willfully (2) and materially (3) committed
> perjury, which is (a) the intentional (b) giving of false testimony (c)
> as to a material matter.

*United States* v. *Zagari*, 111 F.3d 307, 329 (2d Cir. 1997). Testimony is "material" if it would
tend to affect or influence the issue under determination," if believed. U.S.S.G. § 3C1.1, Appl.
Note 6; *see also United States* v. *Fayer*, 573 F.2d 741, 745 (2d Cir. 1978) ("The test of
materiality is whether the false testimony was capable of influencing the fact finder in deciding
the issue before him.").

When the sentencing judge finds that the defendant "has clearly lied" in a
statement made under oath, the judge "need do nothing more to satisfy *Dunnigan* than point to
the obvious lie and find that the defendant knowingly made a false statement on a material
matter." *United States* v. *Williams*, 79 F.3d 334, 337–38 (2d Cir. 1996); *see United States* v.
*Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000). For sentencing purposes, perjury need only be proved
by a preponderance of the evidence. *See United States* v. *Ben-Shimon*, 249 F.3d 98, 102 (2d Cir.
2001). Once its factual predicates have been established, the obstruction adjustment is
mandatory. *See United States* v. *Ruggiero*, 100 F.3d 284, 293–94 (2d Cir. 1996).

The defendant's trial testimony was riddled with lies and fabrications. These lies
were nothing more than thinly veiled attempts to avoid responsibility for assaulting CSO
Esposito, notwithstanding overwhelming eyewitness testimony to the contrary. The defendant's
fabrications regarding his and CSO Esposito's conduct went to the central issue of this case.
Indeed, there was no issue more material to this trial than the circumstances that gave rise to the
physical contact between the defendant and CSO Esposito. "Where, as here, the defendant's
testimony relates to an essential element of his offense, such as his state of mind or his
participation in the acts charged in the indictment, the judgment of conviction necessarily
constitutes a finding that the contested testimony was false." *United States* v. *Bonds*, 933 F.2d
152, 155 (2d Cir. 1991) (per curiam).

Perhaps the most obvious lie was the defendant's patently ridiculous story that
CSO Esposito shoved the security wand down his pants. In addition to being absurd on its face,
the defendant's claim that CSO Esposito placed the security wand down his pants was contrary to
the testimony of each of the witnesses who observed the search. CSO Esposito flatly denied
putting the wand down the defendant's pants, or even ever making contact with the defendant's
body with the wand. *See* Tr. at 184. Nor did any other witness to the incident testify to
observing CSO Esposito place the security wand down the defendant's pants. The defendant's
testimony that it happened made no sense, and was untrue.

The Honorable John F. Keenan
April 10, 2008

        Equally unbelievable was the defendant's insistence that he politely complied with the security procedures and never cursed.  Despite every other witness testifying to the contrary, the defendant maintained that he kept his composure throughout the screening process and did not utter a single vulgarity:

> THE COURT:  Did you hear each of the officers testify and did you hear the young man testify yesterday?
>
> THE WITNESS:  Yes.
>
> THE COURT:  Mr. Herbert?
>
> THE WITNESS:  Yes
>
> THE COURT:  Did you hear what they had to say?
>
> THE WITNESS:  Yeah.
>
> THE COURT:  Were you swearing or cursing?
>
> THE WITNESS:  No, I don't curse.  I don't swear.
>
> THE COURT:  I see.  So, none of those things happened.  You didn't say anything about people being difficult with you – I am not using the words they used.  You didn't say anything like that?
>
> THE WITNESS:  I didn't say anything.  I wasn't even talking.

Tr. at 352.

> Q:     Were you cursing at this point [when CSO Esposito performed the security check with the wand]?
>
> A:     No.
>
> Q:     You still weren't cursing?
>
> A:     No, I didn't talk to him.  As soon as the thing happened, I turned around and start talking to the other people, complaining to the other people.
>
> Q:     What about to these people; were you cursing at them?

-10-

The Honorable John F. Keenan
April 10, 2008

> A:    No.  I was saying but why he has to do this with me, what is it for.  And I wasn't getting any answer.  Mr. Russo just said okay, then he said go back.
>
> Q:    Fair to say you were agitated at this point?
>
> A:    No.  The video tells that –
>
> Q:    You weren't angry?
>
> A:    No.
>
> Q:    You were perfectly calm and collected?
>
> A:    Yeah.  I would say so.

Tr. at 354–55.

> Q:    At any time did you say to Officer Esposito, why are you busting my balls?
>
> A:    No.
>
> Q:    You never said that?
>
> A:    No.
>
> Q:    At any time did you swear at Officer Esposito?
>
> A:    No.
>
> Q:    At any time did you call Officer Esposito a name?
>
> A:    No.
>
> Q:    Did you call any of the officers a name?
>
> A:    No.  I don't swear.  It is against my religion.  I don't swear.  I don't curse.

Tr. at 356–57.

        Every other witness testified otherwise.  CSO Esposito recalled that the defendant was "very irritable" and was saying "'F'ing bullshit,' stuff like that."  Tr. at 66; *accord* Tr. at 68 (explaining that during the security screening, "[The defendant] was carrying on.  He was

-11-

The Honorable John F. Keenan
April 10, 2008

complaining. He was cursing. And that's – totally out of hand. And very irrational."). CSO
Russo similarly recalled that the defendant "was spewing profanities." Tr. at 207. CSO
Calvacca testified that the defendant "was saying 'fuck this' and 'fuck that,' 'this is fucking
bullshit,' 'you guys are assholes,' 'why do have to go through this fucking shit.'" Tr. at 233.
CSO Horvath likewise recalled that the defendant was cursing and swearing. *See* Tr. at 248.
Agent Herbert – who had absolutely no bias to testify in favor of CSO Esposito – recalled that
the defendant exclaimed, "get your fucking hands off of me" as he struck CSO Esposito. Tr. at
266.

   Further support for the obstruction enhancement comes from the defendant's
claim at trial that he did not make physical contact with CSO Esposito. The defendant testified:

  Q: Now, are you aware if your right hand came into contact with Officer
    Esposito's face?

  A: No. No, no, no. My right hand had not come in contact with him.

Tr. at 327. Soon later, the defendant continued to insist that neither his hand, nor the security
wand which he claimed to swat away, made contact with CSO Esposito:

  Q: Did you intend to have the wand come into contact with Officer Esposito's
    face?

  A: I no – I would not use the word "intend," because not a script that we're
    playing. It's something that has occurred. And I'm, I – believe that the
    contact did not – I mean the wand did not come in contact with him.

  THE COURT:  Did you mean to have the wand hit his face?

  THE WITNESS:  No.

  THE COURT:  Did the wand hit his face?

  THE WITNESS:  I don't think so.

Tr. at 329.

   Yet again, every witness who was able to see the incident flatly contradicted the
defendant's claim that he never made contact with CSO Esposito. CSO Esposito testified that he
saw the defendant's fist violently approach his face and strike him near the left eye. *See* Tr. at
71. CSO Calvacca saw the defendant "rear his hands up" and strike CSO Esposito in the face.
Tr. at 234–35. Agent Herbert also saw the defendant make physical contact with CSO Esposito,

-12-

The Honorable John F. Keenan
April 10, 2008

striking the officer in the arms, forcefully pushing the officer back, and stating, "get your fucking hands off of me." Tr. at 265–66. Although CSOs Horvath and Russo were unable to see actual physical contact from their angles, both saw the defendant raise his hands and CSO Esposito then move back in a manner consistent with being struck. *See* Tr. at 208, 249–50.

Given the nature of the defendant's testimony, it is clear that the defendant's lies were willful. His materially false statements regarding the actions taken by CSO Esposito, whether he struck the officer, and his own conduct as he proceeded through the security process, could not have been accidentally false. Indeed, the defendant recited many aspects of his false testimony more than once, which indicates that he was not merely mistaken or confused when he testified falsely.

In light of the above, the Government respectfully submits that the Court should find that the defendant willfully, materially, and intentionally gave false testimony concerning material matters at his trial, and that the defendant should receive a two-level increase in his offense level.

## C.    The Court Should Impose a Two-Level Increase Because the Victim Sustained Bodily Injury, Pursuant to Guidelines Sections 2A2.4(b)(2) and 1B1.1

The defendant objects to a two-level enhancement for bodily injury, pursuant to Guidelines Section 2A2.4(b)(2), on the grounds that the jury acquitted the defendant on the highest offense. *See* Deft. Ltr. at 2. This position conflates the burdens of proof at trial and sentencing. Under Supreme Court and Second Circuit precedent, acquitted conduct can serve the basis for a sentencing enhancement, provided that the conduct was established by a preponderance of the evidence.

Section 2A2.4(b)(2) of the Guidelines provides for a two-level increase if "the victim sustained bodily injury." U.S.S.G. § 2A2.4(b)(2). For purposes of this provision, the definition of "bodily injury" is found in Application Note 1 to the Commentary to Guidelines Section 1B1.1. *See* U.S.S.G. § 2A2.4, Appl. Note 1. That application note defines "bodily injury" as "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, Appl. Note 1(B). "Visible injuries such as bumps, bruises, and redness or swelling are sufficient to constitute 'bodily injury.'" *United States* v. *Brown*, 200 F.3d 700, 709 (10th Cir. 1999). Nor must a victim manifest outward signs of injury to sustain the enhancement; rather, a victim's testimony, without physical evidence, may be sufficient. *See United States* v. *Hoelzer*, 183 F.3d 880, 882 (8th Cir. 1999); *United States* v. *Johnson*, 121 F.3d 1141, 1145 (8th Cir. 1997).

The evidence at trial established, by a preponderance of the evidence, that CSO Esposito suffered "bodily injury," for purposes of the two-level increase under Guidelines Section 2A2.4(b)(2). This evidence came both in the form of eyewitness testimony and

The Honorable John F. Keenan
April 10, 2008

documentary evidence from New York Downtown Hospital.

As to the witness testimony, no one was in better position to say if CSO Esposito suffered bodily injury than CSO Esposito himself. CSO Esposito testified that the strike from the defendant broke skin and caused him pain:

> Q:    Can you describe how you felt as the defendant struck you?
>
> A:    Well, I was hurting. It's pain. You know, you're hit in the face, you're in pain.

Tr. at 72; *accord* Tr. at 84 (CSO Esposito explaining that he "was hurt"). CSO Calvacca then gave CSO Esposito a handkerchief, which he used to wipe the blood from his face. *See* Tr. at 86, 235–36. CSO Esposito proceeded to the fourth floor of the Courthouse, where paramedics administered first aid to stop the bleeding near his left eye. *See* Tr. at 88. CSO Esposito subsequently was transported by ambulance to the emergency room of New York Downtown Hospital, where he recalled receiving "two stitches in the left eye and a tetanus shot." *Id.* Each of the other CSOs on duty that day also observed blood coming down CSO Esposito's face immediately after the assault. *See* Tr. at 73, 208–09, 235–36.

This testimony was substantiated by medical records for CSO Esposito's treatment at New York Downtown Hospital. *See* Tr. 186–195. Diane Chappelle, the Director of Health Information Management and Patient Administration Services at New York Downtown Hospital, testified to various hospital records pertaining to the treatment that CSO Esposito received on August 22, 2007. The ambulance call report (Exhibit 6-A) revealed that CSO Esposito suffered a one-quarter inch laceration above his left eyebrow as well as head trauma. *See* Tr. at 192–93. The emergency physician record (Exhibit 7-A), which was filled out by the physician who treated CSO Esposito at the hospital, showed that the officer suffered a one-half centimeter laceration next to his left eyebrow, and that he was seen by a plastic surgeon. *See* Tr. at 193. The laboratory report (Exhibit 14-A) reflected that tetanus and diphtheria shots were ordered. *See* Tr. at 194. Finally, the progress note from the emergency room (Exhibit 15-A) contained a plastic surgeon note indicating that the cut to CSO Esposito's left eyebrow was closed with a suture. *See* Tr. at 195.

Clearly, the injury suffered by CSO Esposito – a laceration near his left eye that required stitches at an emergency room – is the sort of injury "for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, Appl. Note 1(B). Indeed, CSO Esposito received medical treatment at both the Courthouse and then at a hospital emergency room. This injury also was "obvious," as the blood coming down CSO Esposito's face was readily observed by the other CSOs on duty. *See United States* v. *Green*, 964 F.2d 911, 912 (9th Cir. 1992) (finding an injury "obvious" for purposes of Guidelines Section 1B1.1, where "the victim's cheek was red and swollen and the defendant's handprint was visible on the skin"). Finally, the

-14-

The Honorable John F. Keenan
April 10, 2008

injury was painful, as CSO Esposito himself testified.  *See* Tr. at 72, 84.

        Courts repeatedly have affirmed similar or less serious injuries, including injuries
that did not require medical attention, as satisfying the Guidelines definition of "bodily injury."
*See, e.g.*, *United States* v. *Obando-Romero*, 246 Fed. Appx. 226, 2007 WL 2461813, at *1 (4th
Cir. Aug. 24, 2007) (black eye); *United States* v. *Grimes*, 219 Fed. Appx. 552, 556, 2007 WL
755189, at *3 (7th Cir. March 14, 2007) (redness and bruising on chest as reported by examining
physician, even though injuries not visible in photographs); *United States* v. *Ledford*, 218 F.3d
684, 686, 690 (7th Cir. 2000) (chest contusion leading to hospitalization for examination);
*United States* v. *Brown*, 200 F.3d at 709–10 (bleeding and a severe headache from about six
blows, as well as swelling, bruises, cuts, and lumps on the victim's face); *United States* v.
*Perkins*, 132 F.3d 1324, 1326 (10th Cir. 1997) (small laceration, bruising, and neck and shoulder
pain leading to chiropractic treatment); *United States* v. *Hamm*, 13 F.3d 1126, 1127–28 (7th Cir.
1994) (bumps and bruises, and the wind knocked out of the victim); *United States* v. *Green*, 964
F.2d at 912 (swelling and pain caused by slaps to the face that did not require medical attention);
*United States* v. *Muhammad*, 948 F.2d 1449, 1456 (6th Cir. 1991) (numerous abrasions,
hyperextension of the shoulder, and two weeks of soreness in knees and elbows).

        Nor should the fact that the jury acquitted the defendant of the enhanced crime of
assault with bodily injury, under 18 U.S.C. § 111(b), preclude the imposition of the bodily injury
enhancement.  In *United States* v. *Watts*, 519 U.S. 148 (1997), the United States Supreme Court
held that "a jury's verdict of acquittal does not prevent the sentencing court from considering
conduct underlying the acquitted charge, so long as that conduct has been proved by a
preponderance of the evidence." *Id.* at 157.  The Court explained that a "jury cannot be said to
have 'necessary rejected' any facts when it returns a general verdict of not guilty." *Id.* at 155.
Rather, "[a]n acquittal can only be an acknowledgment that the government failed to prove an
essential element of the offense beyond a reasonable doubt." *Id.* (quotations omitted).

        The Second Circuit has ruled conclusively — and, following the Supreme Court's
decision in *United States* v. *Booker*, 543 U.S. 220 (2005), has continued to hold — that acquitted
conduct may be considered for sentencing purposes under the Guidelines.  *See United States* v.
*Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005) (holding that post-*Booker*, a district court may take
acquitted conduct into account when sentencing a defendant), *cert. denied*, 547 U.S. 1060
(2006); *United States* v. *Concepcion*, 983 F.2d 369, 390–91 (2d Cir. 1992); *see also United
States* v. *Juwa*, — F.3d —, 2007 WL 4179834, *6 (2d Cir. Nov. 28, 2007) ("A sentencing court
is not limited to considering only evidence of the convicted offense; it may take into account
other relevant conduct, and even acquitted conduct[.]") (citations to U.S.S.G. § 1B1.3, *Vaughn*,
and other authority omitted); *United States* v. *Singh*, 390 F.3d 168, 191 (2d Cir. 2004) ("It is
well-settled that acquitted conduct can be taken into account in sentencing and that a
preponderance of the evidence is all that is required to prove the amount of loss.").  The Second
Circuit specifically concluded in *Vaughn* that *Booker* does not "undermine the continued validity
of the ruling in *Watts*." *Vaughn*, 430 F.3d at 526.

The Honorable John F. Keenan
April 10, 2008

   Once again, the defendant's reliance on *Apprendi* is misplaced. *See* Deft. Ltr. at 2 n.1 ("The defendant submits that Probation's reliance upon United States v. Watts, 519 U.S. 148 (1977) and United States v. Concepcion, 983 F.2d 369 (1992) is misplaced. Both decisions were sub silentio rendered moot by Apprendi, supra."). *Apprendi* is inapplicable in this case, as the defendant's advisory Guidelines range is below the 8-year statutory maximum for a felony under Title 18, United States Code, Section 111(a). Moreover, as confirmed by the 2005 Second Circuit decision in *Vaughn*, *Watts* remains good law.

**D. The Defendant Should Not Receive a Two-Level Decrease for Acceptance of Responsibility Pursuant to Guidelines Section 3E1.1(a)**

   The PSI reports that defense counsel voiced his intent to argue for a two-level decrease for acceptance of responsibility pursuant to Guidelines Section 3E1.1(a), on the grounds that the defendant testified at trial. *See* PSI ¶ 69. The defendant's sentencing submission, however, does not pursue this argument. In any event, because the defendant's trial testimony was riddled with lies, a decrease for acceptance of responsibility is entirely inappropriate in this case.

   Section 3E1.1 of the Guidelines provides for a two-level decrease "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential facts of guilty, is convicted, and only then admits guilty and expresses remorse." U.S.S.G. § 3E1.1, Appl. Note 2. Only in "rare situations" may a defendant convicted after trial receive a reduction for acceptance of responsibility. *See id.* Such situations "may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or challenge to the applicability of a statute to his conduct)." *Id.*

   This is not one of the "rare situations" where the defendant accepted responsibility, yet proceeded to trial. He did not go to trial to assert or preserve an issue that did not relate to factual guilt. To the contrary, as discussed more fully above at *supra* II.B., the defendant falsely testified regarding various material issues, including whether he made physical contact with CSO Esposito, the actions taken by CSO Esposito during the search, and how the defendant behaved as he proceeded through the security checkpoint. Clearly, the defendant did not accept responsibility for his criminal conduct in this case.

The Honorable John F. Keenan
April 10, 2008

**E.    The Court Should Impose a Term of Imprisonment Within the Advisory Guidelines Range of 24 to 30 Months**

   The above analysis would result in an advisory Guidelines range of 24 to 30 months' imprisonment, calculated as follows:

- Base offense level of 10, pursuant to Guidelines Section 2A2.4(a).
- 3-level increase pursuant to Guidelines Section 2A2.4(b)(1), because the offense involved physical contact with CSO Esposito.
- 2-level increase, pursuant to Guidelines Section 2A2.4(b)(2), because the victim, CSO Esposito, sustained bodily injury.
- 2-level increase, pursuant to Guidelines Section 3C1.1, because the defendant obstructed justice by lying and providing false testimony.
- 0-level decrease for acceptance of responsibility, pursuant to Guidelines Section 3E1.1(a).

Accordingly, the resulting offense level is 17, which, in light of the defendant's Criminal History Category of I, yields an advisory Guidelines range of 24 to 30 months' imprisonment.

   The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court recently stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

   After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall* v. *United States*, 128 S. Ct. at 596 & n.6.

The Honorable John F. Keenan
April 10, 2008

        In determining the appropriate sentence, 18 U.S.C. § 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B)     to afford adequate deterrence to criminal conduct;

> (C)     to protect the public from further crimes of the defendant; and

> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

        Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 128 S. Ct. at 596 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594; *see also Rita* v. *United States*, 127 S. Ct. at 2464. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 128 S. Ct. at 597.

        In the present case, a sentence within the advisory Guidelines range of 24 to 30 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. From a categorical perspective, the Guidelines range that applies in this case reflects the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). *Rita*, 127 S. Ct. at 2464. The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," and accordingly, the guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.*

        From an individual perspective, the defendant assaulted a federal officer, who was charged with the extremely serious responsibility of maintaining security at this Courthouse. The

The Honorable John F. Keenan
April 10, 2008

importance of the security duties of CSOs cannot be overstated.  As CSO Esposito testified, the job of a CSO is to maintain the security of the building and its perimeter.  *See* Tr. at 34.  In particular, the defendant assaulted CSO Esposito as he was conducting a search for "weapons, any kind of parts of weapons, parts of bombs, anything that's – would be suspicious."  Tr. at 58.

The defendant devotes a substantial portion of his sentencing submission to continuing to dispute findings made by the jury, particularly with respect to whether he intentionally assaulted CSO Esposito.  *See, e.g.*, Deft. Ltr. at 9 ("The instant conduct was clearly not an intentional assault resulting in injury."); *id.* at 5 ("[T]he defendant submits that a review of the video reveals that significant factual issues exist concerning the second [and] fourth elements, i.e. whether Nogbou acted 'willfully' and 'forcibly.'"; setting forth legal definitions of "forcibly" and "willfully").  The defendant even goes so far as to argue that "there is not a scintilla of evidence to demonstrate any form of intentional assaultive contact by Nogbou upon CSO Esposito at this point [when the physical contact occurred]."  *Id.* at 4.  The defendant also relies upon Agent Herbert's testimony to suggest that any physical contact with CSO Esposito was unintentional.  *See id.* at 7 ("As a result of Nogbou's lifting of his arms CSO Esposito's arms likewise came upward and apparently the wand then came into contact with his face.").  In other words, the defendant now seeks to relitigate the issue of his guilt and continues to insist that he did not intend to assault CSO Esposito.

But that is not what the jury found.  The jury convicted the defendant of a felony, finding the following essential elements beyond a reasonable doubt: (1) on or about August 22, 2007, CSO Esposito was a federal officer within the meaning of the statute; (2) on or about that same time, the defendant *forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with* CSO Esposito, and this forcible action involved actual physical contact with CSO Esposito; (3) at that time, CSO Esposito was engaged in the performance of his official duties; and (4) the defendant *acted knowingly, intentionally, and voluntarily*.  (Emphases added).

The defendant also makes the extremely insulting and utterly unfounded accusation that the CSOs on duty did not consider him to belong in the courthouse.  *See* Deft. Ltr. at 8 ("Nogbou a homeless man carrying most of his belongings into the Courthouse was not perceived aby [sic] the CSOs as an individual with a valid basis for entering the building.").  There was not a hint of trial evidence to support this shocking accusation against individuals whose daily responsibility is to ensure the safety and security of the Courthouse.  Quite to the contrary, the unyielding testimony of every witness other than the defendant was that, at all points, the CSOs treated the defendant professionally and with respect, even as the defendant lobbed profanities toward them.

Although there is no basis to infer that the CSOs prejudged the defendant, the defendant's litigious history reflects a clear distrust of law enforcement, which was manifested on August 22, 2007.  Since 2005, the defendant has filed three lawsuits in this District against officers of the New York City Police Department and other law enforcement officers, alleging

-19-

The Honorable John F. Keenan
April 10, 2008

violations of his civil rights.[2]  The defendant filed his most recent lawsuit on August 6, 2007, just over two weeks before the assault that gave rise to the instant conviction.  Additionally, it appears that the defendant's very purpose in visiting the federal courthouse on August 22, 2007 was to file an amended complaint in one of his pending cases against law enforcement officers.

These lawsuits reflect animus, general distrust, and hostility on the part of the defendant toward law enforcement officers.  Moreover, the defendant testified that when he last came to the Courthouse, just three weeks before August 22, 2007, a female CSO supposedly touched him inappropriately in his private area.  *See* Tr. at 310.  It was not the CSOs who were predisposed to treat the defendant with a suspicious eye; it was the defendant who was predisposed to distrust the CSOs.

Finally, the Court should reject the defendant's request that he receive a sentence below the advisory Guidelines range to account for the possibility that, after serving his sentence in connection with the instant conviction, he will spend time in Immigration custody before being deported.  *See* Deft. Ltr. at 2 ("Moreover, a BICE detainer having been lodged upon the defendant upon imposition of a sentence of Time Served rather than being released from custody Nogbou will be transferred to BICE custody.  He will in all likelihood then be removed to his native Ivory Coast following the completion of deportation proceedings."); *id.* at 11 ("A sentence of Time Served, which is 8 months incarceration coupled with the fact that he will not be released from custody, but rather will be immediately transferred to BICE custody for removal proceedings would facilitate the goals set forth in the Parsimony clause of 18 U.S.C. 3553a.").  This request should be denied.  Detention for immigration purposes is imposed as a result of the actions of Immigration officials and not at the request of the United States Attorney's Office.  It is not part of any sentence the defendant may receive in this case.  Moreover, the Court should not consider any post-sentence detention time as such time is hypothetical and thus not appropriately considered for sentencing purposes.

---

[2]     These lawsuits are *Nogbou* v. *United States Postmaster General*, 05 Civ. 5304 (RMB); *Nogbou* v. *Mayrose et al.*, 07 Civ. 3763 (RWS); and *Nogbou* v. *Lore*, 07 Civ. 8515 (RWS).

-20-

The Honorable John F. Keenan
April 10, 2008

### III.  Conclusion

For the reasons set forth above, a sentence within the Guidelines range of 24 to 30 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:    /s/ John P. Cronan
       John P. Cronan
       Assistant United States Attorney
       Tel.: (212) 637-2779
       Fax:  (212) 637-2390

cc:    Alan M. Nelson, Esq.
       *By facsimile and electronic mail*